**AFFIRMED and Opinion Filed August 22, 2019**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-01457-CV

### CHARLES CHANG, M.D., Appellant
### V.
### ASHLEY DENNY, Appellee

**On Appeal from the 401st Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 401-02470-2013**

## MEMORANDUM OPINION

Before Justices Schenck, Osborne, and Reichek
Opinion by Justice Reichek

Seven years after Dr. Charles Chang mistakenly left a cotton ball in Ashley Denny's brain following surgery, Denny sued him for medical malpractice. A jury found in Denny's favor on her negligence claim and awarded her damages for past and future loss of earning capacity. The jury also found that Denny prosecuted her claim with diligence after discovering her injury.

In two issues on appeal, Dr. Chang generally contends the trial court erred in denying his motion for judgment notwithstanding the verdict (JNOV) and in admitting evidence related to Denny's diligence in filing suit and Social Security disability benefits. For the reasons set out below, we overrule Dr. Chang's issues and affirm the trial court's judgment.

FACTUAL BACKGROUND

In July 2006, Denny learned she had a brain tumor. She was twenty-six years old. Denny was referred to Dr. Chang, who performed the surgery four days later. The tumor was large and was located in the right lateral ventricle, which is a fluid space deep in the brain. During the surgery, Dr. Chang used nonradiopaque cotton balls (meaning they were not X-ray detectable) in Denny's brain and separated one of the balls into pieces, rather than leaving it in its original form. Both actions violated hospital guidelines enacted to account for items used during surgical procedures so that none would be "left behind." Dr. Chang said at the end of Denny's surgery, all the cotton balls used were accounted for when he made a count of the surgical items.[1]

The mass removed was an intraventricular neurocytoma, a benign tumor. Denny was hospitalized for eleven days after the surgery and had several post-operative MRI scans during that time. The scans showed a "ring of enhancement" at the site of the surgery that Dr. Chang believed might be a "residual tumor." He never suspected it was a foreign body left in her brain during the surgery. Over the next five years, Denny continued follow-up care with Dr. Chang, who monitored the area with MRI scans for evidence of recurrent tumor growth. During that time, Denny said she told Dr. Chang she still had headaches and other symptoms, but he told her not to worry, it was "scar tissue."

In May 2011, almost five years after the original surgery, Denny had an MRI which appeared to show a "slight enlargement" in the "residual tumor," and Dr. Chang performed a second surgery on May 26. He went through the same opening as in the first surgery and found a "nodular lump" sitting in the ventricle at the base. The lump turned out to be a cotton ball covered in scar tissue, which had adhered to Denny's brain. The cotton ball had been unknowingly left

---

[1] Dr. Chang testified operating room protocol requires a count of all sponges, scalpel blades, needles, etc., before the surgery begins and, if anything is added during surgery, to add them to the count. At the end of the procedure, at least two final counts are performed—one at the beginning of closure and one toward the end of closure. If the counts are off, it is necessary to determine what is missing and "go about finding it." In this case, the counts did not show anything missing.

behind in the previous surgery. Dr. Chang cut out the cotton ball, which included a "scant" portion of Denny's brain. The subsequent pathology report showed the cotton ball was larger than one inch (2.7 centimeters) and had brain matter attached to it. Immediately after the surgery, Dr. Chang told Denny's parents that the abnormal mass in Denny's brain was not a tumor but a cotton ball left behind in the first surgery. Denny's parents told her the next day.

Denny testified that her recovery from the second surgery was "much worse" because she was older and Dr. Chang went into an area of her brain that had already been traumatized. She said she still does not "feel well" on a daily basis. Her symptoms are "dramatically different" from the first surgery when headaches and ringing in her ears would "creep in" but, unlike now, were not chronic. After the second surgery, she has periodic ringing in her ears, experiences dizziness if she "moves around too much," and wakes up each day to a "throbbing" headache near the front of her head. She described her balance and coordination as "not good," and said she was a runner but can no longer run because she is clumsy and "constantly tripping over things." Denny also said she gets lost, and by way of example, said she was in the wrong courtroom for trial for fifteen minutes the previous day. She tends to repeat herself, which she never did before, and has difficulty formulating thoughts, which she said is "frustrating" because she knows what she wants to say but just cannot "get it out." Lights, sounds, and smells bother her on occasion, and she has trouble with her short-term memory and writes notes to herself so she does not forget things. She said, for example, she will forget she called someone and then call them again five minutes later. She is irritable with people and feels like a "fuse" has been "fried" and she was not like that before the second surgery. Denny said she was "very much a people person, on the go, very busy" and no longer is.

Denny said she signed a consent form before the surgery warning her that she could experience memory loss, loss of coordination, seizures, pain, and numbness, among other things,

–3–

as a result of the surgery. Denny said she has all of those side effects, none of which she had after the first surgery. She takes seventeen new pills each day, including antiseizure, epilepsy, and antianxiety medications, prescribed by a neurologist to help with her symptoms.

Denny described how the aftermath of the surgery affected her life. Shortly after her first surgery in 2006, she began a new job with an eyewear company as a sales representative in Texas, Arkansas, and Louisiana. She traveled every week and was "very successful." She earned an average of $60,000 to $70,000 annually, with bonuses and commissions. She believed she was "really good" at her job and was "just starting" her career. Fifteen months after the second surgery, she was fired because she could no longer perform her work. After she lost her job, she had to liquidate her retirement savings and move from Dallas to Arkansas to live with her parents. When she ran out of money, she applied for Social Security disability benefits and, after evaluation by multiple doctors and other government personnel, was approved and put on 100 percent disability. Although she would like to work, she said she had not driven since she lost her job and cannot pass the driver's exam. That leaves her dependent on her husband to take her everywhere, even the grocery store, she said.

Denny said that because of the 2011 surgery, she lost her ability to be gainfully employed, lost her ability to be independent, and was forced to go on government assistance. She said she is a thirty-seven-year-old woman who cannot function without being dependent on others. At the time of trial, it had been six years since the second surgery and her symptoms had not improved, but she hoped they would in the future. She said it had been a "nightmare."

Denny last saw Dr. Chang during an office appointment on July 21, 2011 at which time she said he told her for the first time that he left a cotton ball in her head (although Denny's parents

had already told her about the error).[2]   Either that day or the day after, she said she met with her lawyer for the first time but did not file suit until June 2013.[3]   In response to her suit, Dr. Chang asserted Denny's claims were barred by the two-year statute of limitations set out in the Texas Medical Liability Act because she waited almost seven years from the date of the alleged negligence (the first surgery in July 2006) to file her lawsuit.   Denny countered that she brought her claims diligently once she learned of the negligence following the second surgery in May 2011 and her suit should be allowed to go forward under the open courts provision of the Texas Constitution.

At trial, she gave a number of reasons as to why it took her twenty-five months from the time she learned of the cotton ball to file the lawsuit.   First, after she left Dr. Chang, she said it took her eight months to find a doctor willing to treat her because the doctors feared they were going to be dragged into litigation.   During that time, she said she called UT Southwestern Medical Center daily in an attempt to meet with a doctor before she finally talked to someone kind enough to help her out.   Second, she said there were times she was "either physically not well" or "emotionally not well" and could not help her lawyer.   She said there were times he called and needed to speak to her about her case, but she was not able to talk to him.   Finally, she said she knew she needed an expert to render an opinion about what had happened, and it took "multiple years" to find one because "no one wanted to touch - - no one was willing to put their hands on this."   When asked if she "made all reasonable efforts to do everything the law required" of her before filing suit, she said she "[a]bsolutely" had and never delayed "just to delay."

Dr. William Hudgins, an expert who testified on Denny's behalf at trial, said the second surgery was "probably a little more traumatic" than the first and was necessary only because Dr.

___

[2] Denny testified she did not learn until after the lawsuit was filed that Dr. Chang used nonradiopaque cotton balls during the surgery.  Dr. Chang, however, testified that he told Denny and her parents that fact but he did not remember an "exact date or time."

[3] Although the evidence shows when she first met with counsel, it does not show when she actually retained him.

Chang negligently left a nonradiopaque cotton ball in her brain. As he explained, Dr. Chang had to make another incision through the brain to retract it enough to see into the ventricle, and it was a "major procedure" to go in the ventricle and remove the piece of cotton. According to Dr. Hudgins, cotton is not absorbable and does not dissolve, so the body formed a wall, or "gliotic scar," around the foreign object to seal it off.

Dr. Hudgins testified that Dr. Chang's use of a nonradiopaque cotton ball and leaving the cotton ball in Denny's brain fell below the standard of care for neurosurgeons. Had Dr. Chang used radiopaque cotton balls, the cotton ball left in her brain would have been detected on the follow-up CT scan. Dr. Hudgins said Dr. Chang's negligence "was a cause of injury and need to go back and have more surgery and that sort of thing."

Dr. Chang, a board-certified neurosurgeon, testified as both a fact and expert witness. He went into detail about how he performed both surgeries, the tools he used, and the route he went through in Denny's brain to reach the tumor and, subsequently, the cotton ball. He accepted responsibility "for the medical decision that led to" the cotton ball being left in Denny's brain and acknowledged that he was the person who mistakenly left it behind and who made the decision to use nonradiopaque cotton balls. He agreed that he disobeyed the hospital's manual by using a non-X-ray detectable cotton ball and agreed the manual was designed to prevent what actually happened to Denny; nevertheless, he still uses nonradiopaque cotton balls in surgeries "in selective instances."[4] Dr. Chang agreed the second surgery was completely unnecessary but for the fact he left a foreign object in Denny's brain. He acknowledged that when he removed the cotton ball during the second surgery, he had to cut it away from her brain, although the pathology report showed mostly scar tissue and "very scant brain tissue."

_____

[4] According to Dr. Chang, the radiopaque marker-cotton balls can be stiff and not as "user-friendly in terms of their characteristics" when trying to control bleeding.

According to Dr. Chang, neurological function includes thinking, memory, motor movements, coordination, sensation, vision, hearing, "all senses." But, he told jurors that the route he went through to access the tumor, does not cause "easily measurable brain impairment in terms of functions." Dr. Chang said the "simple fact" of going through the brain "means that part of the brain has undergone some damage, some of the tissue has been damaged. And - - and it can leave permanent scarring in that place." Nevertheless, he acknowledged that he told Denny before the surgery that she could have additional loss of brain function, loss of memory, stroke, blindness, deafness, inability to smell, double vision, loss of coordination, seizures, pain, numbness, and paralysis. Dr. Chang testified that Denny was the "best judge" of what symptoms she had.

After hearing the evidence, the jury found Dr. Chang's negligence in leaving a cotton ball in Denny's brain proximately caused her injury. The jury also found Dr. Chang's negligence in leaving a nonradiopaque cotton ball in her brain caused her injury.[5] The jury awarded Denny $275,000 for loss of earning capacity in the past and $1.54 million for loss of earning capacity in the future, but it awarded no damages for past or future physical pain and mental anguish, past or future disfigurement, or past or future physical impairment. The jury also found that, after discovering her injury, Denny had diligently prosecuted her claim. Dr. Chang moved for JNOV, challenging the jury's findings to the due diligence and the damage questions. The trial court denied Dr. Chang's motion for JNOV and rendered judgment in accordance with the jury's verdict. This appeal followed.

---

[5] The jury answered no to a question inquiring whether Dr. Chang fraudulently concealed, from Denny, the fact that he used nonradiopaque cotton balls.

In his first issue, Dr. Chang argues the trial court erred in denying his motion for JNOV regarding Denny's open courts defense to the statute of limitations as presented in Question 6 of the jury charge and the lack of proximate cause to support damages presented in Question 4, subparts 3 and 4.

We review a trial court's decision to deny a JNOV under the legal sufficiency standard of review. *OIC Holdings, LLC v. Gleason*, No. 05-18-00029-CV, 2019 WL 2098616, at *2 (Tex. App.—Dallas May 14, 2019, no pet.) (mem. op.); *see also City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005) (test for legal sufficiency is same for directed verdict, JNOV, and appellate no-evidence review). A party challenging the legal sufficiency of the evidence supporting an adverse jury finding on an issue on which it did not have the burden of proof at trial must demonstrate on appeal that there is no evidence to support the adverse finding. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.,* 348 S.W.3d 194, 215 (Tex. 2011). The evidence is legally sufficient if it "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller*, 168 S.W.3d at 827. We review the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 819 (Tex. 2012). We will uphold the jury's finding if it is supported by more than a scintilla of competent evidence. *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009).

## OPEN COURTS DEFENSE

We begin with Dr. Chang's complaints regarding Denny's open courts defense to the two-year statute of limitations.[6] He argues that (1) Denny failed to obtain a "proper legal finding" to

---

[6] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.251(a) (providing a two-year statute of limitations on health care liability claims).

establish the defense and (2) alternatively, there is legally insufficient evidence to support the jury's finding.

The Texas Constitution guarantees that persons bringing common-law claims will not unreasonably or arbitrarily be denied access to the courts. TEX. CONST. art. 1 § 13. ("All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law."). This provision grants foreign-object claimants, such as Denny, a reasonable opportunity to discover their injuries and file suit if the two-year limitations period has run. *Walters v. Cleveland Reg'l Med. Ctr.*, 307 S.W.3d 292, 294 (Tex. 2010); *Neagle v. Nelson*, 685 S.W.2d 11, 12 (Tex. 1985).

The provision, however, does not toll limitations. Unlike the discovery rule, which defers the accrual of a cause of action until the plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to the claim, the open courts provision merely gives litigants a reasonable time to discover their injuries and file suit. *Walters*, 307 S.W.3d at 295. In other words, a plaintiff may not obtain relief under the open courts provision if she does not use due diligence and sue within a reasonable time after learning about the alleged wrong. *Shah v. Moss*, 67 S.W.3d 836, 847 (Tex. 2001). The reasonable time is given to allow a claimant to investigate, prepare, and file suit after discovering her injury. *Gagnier v. Wichelhaus*, 17 S.W.3d 739, 745 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) (citing *Neagle*, 685 S.W.2d at 14 (Kilgarlin, J., concurring)).[7] Whether a plaintiff has used the degree of diligence required is ordinarily a question of fact; however, it may be determined as a matter of law when the evidence, construed most favorably to the claimant, admits no other conclusion. *Id.*

---

[7] Several courts of appeals have relied on the language of Justice Kilgarlin's concurring opinion in *Neagle*. *See Pech v. Estate of Tavarez*, 112 S.W.3d 282, 285–86 (Tex. App.—Corpus Christi-Edinburg 2003, no pet.); *Thompson v. Pate*, 69 S.W.3d 743, 748 (Tex. App.—El Paso 2002, no pet.); *Fiore v. HCA Health Servs. of Tex., Inc.*, 915 S.W.2d 233, 237–38 (Tex. App.—Fort Worth 1996, writ denied); *LaGesse v. PrimaCare, Inc.*, 899 S.W.2d 43, 47 (Tex. App.—Eastland 1995, writ denied).

Question 6 asked: "Do you find from a preponderance of the evidence that after discovering the injury, Ashley Denny prosecuted her claim and suit with that degree of diligence that an ordinary prudent person would have exercised under the same or similar circumstances?"[8] The jury responded "yes."

Dr. Chang first argues the question was defective because it asked jurors whether Denny used due diligence to "prosecute her claim," rather than "to file suit," after discovering her injury. Thus, he contends the response is "immaterial and cannot support recovery." We disagree.

To preserve error in the jury charge, a party must make the trial court aware of the complaint, timely and plainly, and obtain a ruling. *Thota v. Young*, 366 S.W.3d 678, 689 (Tex. 2012); *Lowry v. Tarbox*, 537 S.W.3d 599, 616–17 (Tex. App.—San Antonio 2017, pet. denied); *see also* TEX. R. CIV. P. 274 (noting a party must distinctly object to preserve error, and "[a]ny complaint as to a question, definition, or instruction, on account of any defect, omission, or default in pleading, is waived unless specifically included in the objections"); *see* TEX. R. APP. P. 33.1 (requiring a party to timely object and make complaining grounds with sufficient specificity, unless grounds apparent from context, and obtain ruling). Dr. Chang did not object to the question as submitted, and his failure to do so waives his complaint on appeal.

In reaching this conclusion, we are unpersuaded by Dr. Chang's suggestion that Denny submitted an "incorrect theory of recovery" to which he did not need to object. For this proposition, he relies on *United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 481 (Tex. 2017).

In *Levine*, a refinery worker slipped on a piece of plywood that had not been nailed down and fell through an opening in the scaffold. 537 S.W.3d at 467. The worker sued USI, claiming USI was in control of the scaffolding and should have ensured it was in a safe condition. *Id.* at

---

[8] The wording of this question was proposed by Justice Kilgarlin in his concurring opinion in *Neagle*. *See Neagle*, 685 S.W.2d at 15 (Kilgarlin, J., concurring).

–10–

468. The case was tried to a jury. The jury was charged on a general negligence theory and returned a modest verdict in the worker's favor. *Id*. The trial court subsequently granted the worker's motion for new trial, and the case was tried a second time. *Id*. Again, the jury was given a general negligence charge, instead of a premises liability theory, and USI did not object. Again, the jury found in the worker's favor. *Id*. USI filed a motion for JNOV, arguing the appropriate cause of action was premises liability. The supreme court ultimately agreed, concluding the case sounded in premises liability and further concluding USI had no duty to object to the charge when the wrong theory of recovery was submitted and the correct theory was omitted entirely. *Id*. at 479, 481.

This case is unlike *Levine*. Dr. Chang is not arguing that the trial court failed entirely to submit a correct theory of recovery; rather, Dr. Chang's complaint is with the wording of the question and whether it should have tied diligence to the filing of the lawsuit instead of prosecuting the claim. Assuming a substantive distinction exists between the two, any defect requires an objection to preserve error under TEX. R. CIV. P. 274.

Dr. Chang next argues that even if Question 6 was sufficient to submit the open courts defense, the evidence is legally insufficient to support the jury's "yes" answer. Here, he argues the only evidence to support due diligence was that Denny relied upon the advice of counsel that Texas law required her to obtain an expert before filing suit, when, in fact, no such requirement exists. Thus, he argues, without any other legally sufficient explanation, Denny's delay in filing suit constitutes a lack of due diligence as a matter of law.

We review the sufficiency of the evidence against the question the trial court submitted. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). Contrary to Dr. Chang's argument, Denny relied upon more than just her inability to find an expert for the delay in filing suit. Denny testified that after the second surgery, it took her eight months to find a doctor willing to treat her because the doctors feared they were going to be dragged into litigation. During this time, Denny said she

could not "find anybody"—"doctors, neurologists, neurosurgeons, anybody"—who would have anything to do with her "because of what [Dr. Chang] had done." She called UT Southwestern Medical Center every day "begging" to see someone, but was told they would pass it on to a doctor. Finally, after months of calling, she said a nurse practitioner helped her and she got in to see a doctor, who she was with for three years.

In addition, she said there were periods between the 2011 surgery and the filing of suit where she simply was not well enough to meet with her lawyer. She said she was either physically or emotionally "not well" and could not help with the case. The jury did not hear this testimony in a vacuum. Denny, who was determined to be 100 percent disabled after the second surgery, told jurors how traumatic the second surgery was and how different her symptoms were. She explained in depth about the problems she experienced, such as throbbing, daily headaches, memory loss, seizures, pain, and numbness, among others. She took seventeen pills each day to aid in controlling her symptoms. Given that these symptoms continued as of the date of trial, the jury could have reasonably inferred that Denny was hampered in her ability to assist her lawyer throughout the twenty-five months.

Finally, Denny also testified that it took her "multiple years" to find an expert to testify on her behalf. While Dr. Chang is technically correct that Denny did not have to have an expert *before* she filed her lawsuit, she did need to have an expert report within 120 days of filing suit. *See* Act of June 11, 2003, 78th Leg., R.S., ch. 204, § 10.01, sec. 74.351(a), 2003 Tex. Gen. Laws 864, 875 (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a), amended effective September 1, 2013 to run the 120 days from the date of the defendant's original answer). We acknowledge decisions by other courts that an attorney's internal operating procedures and professional decision not to file suit until after an expert opinion is obtained to support the asserted claim is not a reasonable explanation for an extended delay. *See Erickson v. Heim-Hall*, 172

–12–

S.W.3d 664, 666 (Tex. App.—San Antonio 2005, no pet.); *LaGesse v. PrimaCare, Inc.,* 899 S.W.2d 43, 44–45, 47 (Tex. App.—Eastland 1995, writ denied).[9] But we need not decide whether an open courts claimant can rely solely on the need for an expert to delay filing a suit because that is not the issue in this suit. Denny provided an explanation beyond her need of an expert.

Without a doubt, twenty-five months is a long time to be aware of the wrongful conduct before prosecuting a claim. And Dr. Chang has cited to a number of cases, in the summary judgment context, where Texas courts have concluded the open courts claimant failed to show due diligence as a matter of law. *See Tenet Hosps. Ltd. v. Rivera*, 445 S.W.3d 698, 704 (Tex. 2014); *Shah v. Moss*, 67 S.W.3d 836, 839 (Tex. 2001); *Yancy v. United Surgical Partners, Int'l, Inc.*, 236 S.W.3d 778, 786 (Tex. 2007); *Garcia v. Palestine Mem'l Hosp.*, No. 14-00-01144-CV, 2002 WL 192359 (Tex. App.—Houston [14th Dist.] Feb. 7, 2002, no pet.) (not designated for publication). But these cases are distinguishable.

The *Tenet Hospitals* case involved alleged negligence in the birth of a child in 1996. In 2004, an attorney for the mother notified the hospital of the minor's claim, but no suit was filed until 2011, five years after the repose statute's deadline. *Tenet Hosps.*, 445 S.W.3d at 700. The hospital moved for summary judgment on the ground that the repose statute barred the claim, and the mother responded that the repose statute violated the open courts doctrine. *Id*. The court concluded the open courts challenge failed as a matter of law because the mother waited over six-and-a-half years to file suit after giving the hospital notice of the health care liability claim. *Id*. at 704. And, unlike Denny, she offered no explanation for her delay in filing suit. *Id*.

In *Shah*, the plaintiff sued Shah for negligently performing eye surgery and neglecting to provide adequate post-surgical treatment. *Shah*, 67 S.W.3d at 839. Shah moved for summary

---

[9] *Erickson* relied on *LaGesse* for support. But at the time *LaGesse* issued, a plaintiff was not required to provide an expert report within 120 days of filing suit. That law took effect September 1, 2003. *See* Act of June 11, 2003, 78th Leg., R.S., ch. 204, § 10.01, sec. 74.351(a), 2003 Tex. Gen. Laws 864, 875 (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a)).

judgment on limitations, and Moss asserted the limitations statute violated the open courts provision. *Id.* at 840–41. Moss knew about the alleged injury at least seventeen months before he filed suit, and, like the plaintiff in *Tenet Hospitals,* offered no explanation for his delay. *Id.* at 847. Consequently, the court concluded Moss failed to file suit within a reasonable time after discovering his injury. *Id.*

Similarly, in *Yancy,* the plaintiff failed to offer an explanation for delay. There, the plaintiff suffered cardiac arrest when undergoing a procedure to remove kidney stones. *Yancy*, 236 S.W.3d at 780. She was resuscitated but remained comatose after the procedure. *Id.* About nineteen months later, her guardian sued two defendants and then waited another twenty-two months to sue two additional defendants. *Id.* The additional defendants sought summary judgment on statute of limitation grounds, and the guardian raised an open courts challenge. *Id.* Relying on *Shah*, the court ruled that because the guardian offered no explanation for waiting twenty-two months after filing her petition to sue the additional defendants, there was no fact issue to show the guardian sued within a reasonable time after discovering the alleged wrong. *Id.*

In *Garcia*, a plaintiff sued the hospital and surgeon sixteen months after learning a surgical needle was left in his stomach during a prior surgery. The court of appeals determined the delay was unreasonable as a matter of law after reciting the following facts: (1) in January 1992, the plaintiff underwent surgery; in February 1998, an X-ray showed that a foreign object was inside him; and in July 1999, he sued the surgeon and hospital; (2) the plaintiff was incarcerated at the time of the surgery, was paroled in 1994, had his parole revoked in 1995, and was again incarcerated, (2) while in custody, he could not demand that doctors remove the foreign object, (3) in March 1998, the plaintiff asked the doctor who discovered the foreign object to sign an affidavit; (4) in January 1999, he filed a *pro se* lawsuit against the surgeon and prison employees requesting removal of the foreign object; and (5) by May 1999, he had the assistance of an attorney, who

dismissed the federal lawsuit and wrote a letter to him indicating he was preparing a suit against the hospital. 2002 WL 192359, at *1–2.[10]

In each of the cases, the plaintiff failed to offer any explanation for the delay and therefore no fact issue was raised. But, in this case, Denny provided multiple reasons to explain her delay in this suit, all of which we have detailed above. Denny only needed to show more than a scintilla of evidence to defeat Dr. Chang's motion for JNOV. More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). Considering the evidence in the light most favorable to the verdict and indulging every reasonable inference that would support it, we conclude there is more than a scintilla of evidence to show that Denny prosecuted her claim and suit with that degree of diligence that an ordinary prudent person would have exercised under the same or similar circumstances. We overrule the first issue as it relates to Question 6.

LOSS OF EARNING CAPACITY

In the second part of his first issue, Dr. Chang argues the trial court erred in denying his motion for JNOV because the evidence is legally insufficient to support a finding that his negligence proximately caused Denny's loss of earning capacity.

Question 4 asked "what sum of money, if paid now in cash, would fairly and reasonably compensate Ashley Denny for her injuries, if any, that resulted from the occurrence in question?" Within subparts 3 and 4 of the question, the jury awarded $275,000 for loss of earning capacity in the past and $1.54 million for loss of earning capacity in the future.

---

[10] We note that the opinion issued in 2002 and was not designated for publication and therefore has no precedential value. *See* TEX. R. APP. P. 47.7.

In a medical negligence case, the plaintiff bears the burden to prove that the negligence caused an injury. The plaintiff must establish two causal nexuses in order to be entitled to recovery: (a) a causal nexus between the defendant's conduct and the event sued upon and (b) a causal nexus between the event sued upon and the plaintiff's injuries. *Jelinek v. Casas*, 328 S.W.3d 526, 532 (Tex. 2010). Only the second nexus is at issue here.

To meet the legal sufficiency standard in medical malpractice cases, "plaintiffs are required to adduce evidence of a 'reasonable medical probability' or 'reasonable probability' that their injuries were caused by the negligence of one or more defendants, meaning simply that it is 'more likely than not' that the ultimate harm or condition resulted from such negligence." *Id.* at 532. Thus, we examine the record to determine if Denny presented legally sufficient evidence that, "in reasonable medical probability," Dr. Chang's negligence caused Denny's loss of earning capacity.

The essence of Denny's case is that as a result of the second surgery, which was necessary only because Dr. Chang negligently left a cotton ball in her head, she has suffered numerous symptoms that have resulted in her loss of earning capacity. Dr. Chang, however, contends Denny needed expert testimony to prove causation and did not. He argues that because Denny failed to do so, there is no evidence that her loss of earning capacity was caused by his negligence.

In medical malpractice cases, expert testimony regarding causation is the norm: "The general rule has long been that expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors." *Id.* at 533 (quoting *Guevara v. Ferrer*, 247 S.W.3d 662, 665 (Tex. 2007)). But lay testimony can establish causation "in those cases in which general experience and common sense will enable a layman to determine, with reasonable probability, the causal relationship between the event and the condition." *Id.* (quoting *Morgan v. Compugraphic Corp.,* 675 S.W.2d 729, 733 (Tex. 1984)). As explained by the court in *Jelinek:*

When lay testimony is credited as evidence of causation, it usually highlights a connection between two events that is apparent to a casual observer. For example, in *Morgan*, a previously healthy employee, upon exposure to leaking chemicals, suffered watering of the eyes, blurred vision, headaches, and swelling of the breathing passages. 675 S.W.2d 729, 733 (Tex. 1984). In such a circumstance, lay testimony sufficed to connect the specific injury to the negligence with no evidence of causation beyond the leaking chemicals. *Id*. Likewise in *Guevara*, we stated that determining causation of "certain types of pain, bone fractures, and similar basic conditions" following an automobile accident was within the competence of lay jurors. 247 S.W.3d at 668. But we held that expert testimony was required to prove that a patient's medical expenses resulted from the accident, noting that "[p]atients in hospitals are often treated for more than one condition brought on by causes independent of each other." *Id*. at 669. These cases illustrate this basic premise: "[N]on-expert evidence alone is sufficient to support a finding of causation in limited circumstances where both the occurrence and conditions complained of are such that the general experience and common sense of laypersons are sufficient to evaluate the conditions and whether they were probably caused by the occurrence." *Id*. at 668.

*Jelinek*, 328 S.W.3d at 533–34.

Here, Dr. Chang argues there is no evidence to support the damage findings because Denny's expert, Dr. Hudgins, failed to establish a connection between her 2011 surgery and her loss of earning capacity. But Dr. Chang, who himself testified as an expert, ignores his own testimony that he warned Denny of specific risks inherent in the second surgery. Those risks specifically included memory loss, loss of coordination, seizures, and pain and numbness. Dr. Chang further testified that Denny was the "best judge" of her symptoms following the surgery, which according to Dr. Chang, involved him cutting out a "scant" part of Denny's brain to remove the cotton ball.

Denny testified that after the second surgery, she experienced memory loss, loss of coordination, seizures, and pain and numbness, the very risks identified by Dr. Chang, and takes seventeen medications to help with her many symptoms. She also said she did not have these symptoms after her first surgery. Moreover, Denny testified that for several years after her first surgery, she had a successful career as an eyewear sales representative working a three-state territory and traveling weekly. After the second surgery, however, she could no longer perform

her job and was fired. She said she was not able to work, liquidated her retirement savings, and moved to another state to live with her parents. She said she would love to have a "little part-time job, something to just get me back out there," but cannot drive because she cannot pass a driver's test, although she has tried twice. She is disabled and draws government benefits.

Given Dr. Chang's testimony involving the risks of brain surgery and Denny's testimony that she suffered those risks after the second surgery but not the first, a jury could reasonably infer that her condition was proximately caused by the second surgery, which was necessitated by Dr. Chang's negligence in leaving the cotton ball in her brain after the first surgery. The proof offered is more than conjecture, possibility, or suspicion based solely on "evidence of an event followed closely by manifestation of or treatment for conditions which did not occur before the event." *See Guevara*, 247 S.W.3d at 668. To the extent Dr. Chang suggests an expert needed to testify that Denny's condition resulted in her loss of earning capacity, we conclude that a jury, using common sense and experience, could make that determination after considering all of the evidence. *See Morgan*, 675 S.W.2d at 733 (concluding lay testimony sufficed to connect specific injury to negligence with no evidence of causation beyond leaking chemicals).

For the reasons above, we conclude the trial court did not err by denying Dr. Chang's JNOV on Questions 4 and 6. We therefore overrule the first issue.

### ADMISSION OF EVIDENCE

In his second issue, Dr. Chang contends the trial court abused its discretion in allowing Denny to testify (1) about her efforts and the time it took to obtain an expert so that she could file suit and (2) that she applied for and received governmental benefits through Social Security disability.

Evidentiary rulings are committed to the trial court's sound discretion. *Bay Area Healthcare Group, Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007) (per curiam). A trial court

–18–

abuses its discretion when it acts without regard for any guiding rules or principles. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). An appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis in the record for the ruling. *Id*. An appellate court cannot conclude a trial court abused its discretion merely because it would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995).

We begin with evidence regarding Denny's efforts to find an expert. During Denny's direct examination, she was asked: "Now did you come to learn that to even file a lawsuit in the state of Texas against a physician you have to have an expert witness?" Dr. Chang objected that the question was a "misstatement of the law," and the trial court overruled the objection. Denny then responded, "No, sir, I did not."

On appeal, Dr. Chang argues the question misstated the law because Denny was not required to have or identify an expert before or at the time the suit is filed. Rather, during the relevant time period, the statute required Denny to serve an expert report within 120 days of the date she filed suit against him. He argues that Denny's testimony "regarding her ability to find an expert to testify so that she could meet the requirements of Texas law" was error and allowed the jury to consider evidence on the open courts issue "based on an incorrect statement of the law."

Initially, we note the only question that Dr. Chang objected to was the one cited above; he did not object to any other questions posed of Denny regarding her efforts to find an expert nor did he obtain a running objection. *See* Tex. R. App. P. 33.1; *Fold v. Columbia Hosp. at Med. City Dallas Subsidiary, L.P.*, No. 05-07-00724-CV, 2009 WL 2712383, at *1 (Tex. App.—Dallas Aug. 31, 2009, no pet.) (mem. op.) ("To preserve error, a party is required to object every time inadmissible evidence is offered."). Moreover, Denny answered the question negatively. Nevertheless, the question as worded does not have as clear a meaning as Dr. Chang suggests. The

–19–

question did not specifically ask whether a plaintiff had to have an expert *at the time of the filing or before the suit was filed*; rather, it can be read to ask whether Denny was aware she needed an expert for her lawsuit. And while we may agree that she did not technically need an expert by the date she filed the suit, she did need one within 120 days of filing. We conclude the trial court did not abuse its discretion in overruling Dr. Chang's objection to the single question.

Next, Dr. Chang argues the trial court abused its discretion by allowing evidence of Social Security disability as evidence of loss of earning capacity. Here, the trial court allowed Dr. Chang a running objection on this issue. Dr. Chang first argues the evidence should have been excluded under Texas Rule of Civil Procedure 193.6 because Denny did not amend or supplement her disclosures to advise that she was receiving Social Security disability benefits.

If a party learns that her responses to written discovery are incomplete or incorrect, the party must amend or supplement the response. TEX. R. CIV. P. 193.5. Rule 193.6 prohibits a party from offering evidence not timely disclosed in a discovery response unless the trial court also finds good cause or lack of surprise or prejudice. *See* TEX. R. CIV. P. 193.6(a).

Below, Dr. Chang objected that "Social Security hasn't been identified as a person with knowledge of relevant facts" and that he had not been provided documentation that Denny was on disability. The trial court asked if Denny was deposed, and Dr. Chang's counsel said she was not. And he acknowledged that he was provided a damage calculation, although it did not refer to disability income.

On appeal, Dr. Chang generally directs us to Denny's Rule 194 Disclosures and her supplemental responses to his request for disclosure. Although he does not identify which disclosure required amendment or supplementation, he did request disclosure of the amount and any method of calculating economic damages. TEX. R. CIV. P. 194.2(d). In her supplemental response, Denny disclosed the amount of damages she was seeking, which included her lost

earning capacity in the past and in the future, and provided a calculation. This information was responsive to the particular request for disclosure, and Dr. Chang does not provide any argument as to why the calculation needed amendment or supplementation.

In addition, within her disclosure on her damage calculation, Denny disclosed that she had been unable to work since 2012 and "is permanently disabled." Given this information, we reject any notion that Dr. Chang was somehow ambushed at trial with evidence of Denny's disability. Dr. Chang was aware that Denny was claiming permanent disability and could have explored that information through other discovery tools, if he so chose. He chose not to. We conclude the trial court did not abuse its discretion by overruling Dr. Chang's rule 193.6 objection to this evidence.

Dr. Chang next asserts Denny's testimony regarding disability was inadmissible hearsay offered to "show that she cannot work." Hearsay is an out-of-court statement offered to prove the truth of the matter asserted and is inadmissible unless it falls within an exception. *See* TEX. R. EVID. 801–804.

Here, Dr. Chang does not identify any specific testimony by Denny nor argue how any particular testimony violated the hearsay rule. Thus, we question whether this issue is adequately briefed. *See* TEX. R. APP. P. 38.1. Regardless, Denny testified that after she used all of her retirement savings, she applied for Social Security disability and that it took two years "to get it." She said she was evaluated by multiple government personnel and doctors and was "approved" and put on "100 percent disability." She testified she receives $1,716 monthly from Social Security. This evidence is not hearsay. These were all facts within Denny's personal knowledge and were not out-of-court statements. We conclude the trial court did not abuse its discretion in allowing evidence of Denny's Social Security disability benefits. We overrule the second issue.

We affirm the trial court's judgment.

/Amanda L. Reichek/
AMANDA L. REICHEK
JUSTICE

Schenck, J., dissenting.

171457F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

CHARLES CHANG, M.D., Appellant

No. 05-17-01457-CV     V.

ASHLEY DENNY, Appellee

On Appeal from the 401st Judicial District Court, Collin County, Texas
Trial Court Cause No. 401-02470-2013.
Opinion delivered by Justice Reichek;
Justices Schenck and Osborne participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee ASHLEY DENNY recover her costs of this appeal and the full amount of the trial court's judgment from appellant CHARLES CHANG, M.D. and from The Ohio Casualty Insurance Company as surety on appellant's supersedeas bond.

Judgment entered August 22, 2019.